WILLIAM C. JONES

*v.*

ANNA P. READ JONES.

[Submitted February 7th, 1914.  Decided July 31st, 1914.]

1. In a husband's suit for divorce, evidence as to the circumstances surrounding the separation of the parties *held* to show that the wife did not desert the husband without his consent.

2. On a wife's petition to open a decree of divorce in favor of the husband, evidence in support of her contention that she failed to defend the suit because of her belief, induced by messages from the husband that the suit would be withdrawn—*Held*, to show surprise, entitling her to have the decree set aside in order that she might defend.

3. A degree of divorce, obtained by a husband by false testimony in a suit which the wife failed to defend, will be vacated on the wife's application, irrespective of the wife's excuse for her default, as the state was an interested party to the suit, and its interests had been imposed upon by the conduct of the husband, requiring that its rights be vindicated.

On petition to open decree *a vinculo.*

*Messrs. Bourgeois & Coulomb* and *Mr. John W. Wescolt,* for the petitioner.

*Mr. Floyd H. Bradley,* for the defendant.

BACKES, V. C.

On August 17th, 1912, the petitioner filed his petition for divorce *a vinculo,* in which he alleged that he cohabited with his wife until June of 1906, when she deserted him, and that for more than two years then last past, her desertion had been willful, continued and obstinate. The cause was undefended, and upon the report of the master to whom it was referred, a decree *nisi* was entered January 17th, 1913, and on July 18th following a final decree of divorce was signed. On November 18th of the same year, before the decree was actually enrolled, the defendant filed her petition praying that the final decree be vacated, and that she be permitted to defend, on the grounds of surprise and merits, in which she sets up that she was deprived of her defence by the fraudulent representations of her husband and that the decree was procured by false testimony imposed upon the court. An order to show cause issued, an answer was filed, and on the day set for trial the parties and their witnesses were heard in open court.

The petitioner and defendant were married in 1886, and lived together as husband and wife until June of 1906. At that time they were living in Camden. During the previous fall, their daughter, a young lady, had been sent to Swarthmore College for a four-year course. She was in delicate health, and for her better protection and comfort the defendant planned to move to the college town. While her husband was in Denver, Colorado, she wrote to him of her intentions, and he replied under date of January 22d (1906) :

"*Anna:*
"Your letter received this A. M. I am very sorry to hear that the children are not well and I am especially anxious about Edna. It might be wise for her to see Dr. Snader, 1919 Arch St., and have him make a thorough examination, particularly of her lungs, and prescribe for her. I have great faith in his ability. In regard to your going to Swarthmore to live, if it will contribute to your happiness or the health of the children it has my entire approval. It might be a good plan for you to consult an agent, as such a person would be more familiar with existing conditions and have knowledge of any opportunities to rent or buy. I expect to be engaged here for some time yet, and cannot say how soon I will be able to go east.
                    "Yours,
                              "WILL."

Upon the strength of this letter, the defendant went to Swarthmore to look for a place, and a few days afterwards wrote to the petitioner a gossipy letter, in which, amongst other things, she said:

*"Dear Will:*
"\* \* \* I suppose you would like to hear of our experience the other day at Swarthmore. Mrs. Keller, Willie and I started about twelve o'clock from Hamilton Court. We went to their country place, got Bill, the work horse. We went all over Swarthmore and saw only three houses that we cared for. Two was out by Strathaven Inn. One is Graham's house, which is $15,000, and the one adjoining it is $11,000. Now Will, I am afraid to mention the other one because it is so high in price, but it is an ideal house. It adjoins the college grounds and it has every convenience. I went to see the agent yesterday. His office is at Thirteenth and Chestnut. J. T. Jackson is his name. When you come home you can go and see him if you like."

She closed the letter with a love message from the children and herself. Upon the petitioner's return to Camden, he negotiated with the owner of the Graham house and purchased it for $12,-000, on April 19th, 1906, placing the title in his wife's name. He paid down $5,000 in cash, and with his wife executed a purchase-money mortgage for the balance. He made extensive alterations to the house, which he personally supervised; purchased rugs and furniture, which he and his daughter selected; paid for the moving of the household effects; made alterations and repairs to the house until recently, and, up to the time of this application, paid the taxes on the property, interest on the mortgage, water rents, electric light bills, telephone bills, besides sending to his wife a weekly allowance of $32.50, which was increased to $35 in the spring of 1913, and to his children each a monthly allowance. In December of 1909, and January of 1910, he purchased, in the name of his wife, additional ground adjoining the Swarthmore home. In all he spent on the property and in supporting his family the sum of $41,500. In the month of June, 1906, the petitioner again went west, and the other members of the family to Atlantic City for the summer, as had been their custom. He returned in the early part of July, and again went to Denver the latter part of August. During this period he made the arrangements for improving the house and for its

furnishing. When the house was substantially completed, the defendant moved into it with her household effects (except some personal belongings of her husband), where she has ever since lived. From that time on, the petitioner never saw his wife to speak to her, although he was a frequent visitor at the house to see his children. The defendant's removal to Swarthmore constituted the alleged desertion upon which the decree of divorce was based.

The testimony taken before the master persuaded him to report that while the petitioner was in the west, the defendant, without his consent or knowledge, went to Atlantic City, where she remained until the month of September, and that during the latter part of the month of October, or the early part of November, 1906, the defendant packed all of her belongings and caused them to be removed to Swarthmore, in the State of Pennsylvania, without the consent or knowledge of the petitioner, at which latter time the defendant deserted the petitioner. And further, that

"The petitioner visited the house where the defendant was living, in Swarthmore, a number of times, and there saw his children; that the defendant, from the testimony shown, avoided meeting her husband, the petitioner, and at other times purposely absented herself from her home in Swarthmore, when she knew that her husband was coming to her home; that defendant stated that she would not return to Camden to live with the petitioner, and it is evident to my mind that the defendant fully intended to desert her husband when she moved from Camden, New Jersey, to Swarthmore, in the State of Pennsylvania."

The petitioner had testified that he lived with his family at 107 North Seventh street, in Camden, until the 15th of June, 1906; that prior to that time he and his wife had several altercations; that on one or two occasions his wife had told him that she would not continue to live in Camden; that he had told her that he could not live anywhere else; that his business required him to live in that city. On June 15th he was obliged to go to Colorado. He returned in seventeen or eighteen days, and then went to his home where he expected to find his wife and children. The house was closed up, and he was informed that they had gone to Atlantic City. He did not see her during the summer, for the reasons stated by him, that he believed she

had gone away in one of her fits of anger, and that it was best to
leave her alone as she would get over it and return all right in
the fall. As he had no place to sleep, he went to his office build-
ing where he furnished a room. Soon after this, about the
middle of September, he was again required to go to Colorado
and was gone until the 1st of November, when he returned and
went immediately to his home, and to his surprise found all of
the furniture moved with the exception of a few pieces of rubbish
and the framed marriage certificate. He learned that his wife
had moved to Swarthmore, and he says, "I then knew that when
she left me she intended to desert me." He further stated that
in the latter part of November, within two or three weeks of his
return, he went to Swarthmore to see his wife, and talk over
marital relations and about continuing the home in Camden;
that he did not succeed in seeing her at that time; that he was
informed that his wife was "not at home;" that within the next
two years following he made six or more trips to Swarthmore to
see his wife, for the purpose of arranging a home in the city of
Camden, and for her to return and live with him, but that he did
not succeed; that whenever he went there he was told that she
was not at home, although upon some occasions he believed that
she was, but would not see him; that during the next four years
he went to Swarthmore many times and saw his children, but
on no occasion was he able to, nor did he, see his wife; that he
had never had any conversation with her since she had left for
Swarthmore; that his wife has never written to him or commu-
nicated with him in any way whatsoever since that time; that
he has never had intercourse with his wife after she left him in
June, 1906, and that he believed that she left him because of ex-
treme jealousy; that he knew of no other reason for her leaving
him, and that in fact there was no ground for her suspicion and
jealousy; that he had supplied money for the support and edu-
cation of his children, but whether any of the money sent for the
support and education of the children was used by the wife, he
did not know; that when he went to Swarthmore it was for the
purpose of talking with his wife and having her return to their
home in Camden, where he had provided a home, or to provide
such other place as might be agreed upon between them; that

his wife knew that he was calling upon her children, and she must have known that he endeavored to see her a number of times, because he was at the house so many times, but she at no time allowed him to see her nor did she offer to see him. That, therefore, he was unable to talk with her or make any provision in accordance with her wish, if she had any to express; that he did not write to his wife because he thought he could make himself better understood by seeing her personally; that they could have arranged the matter between them, and by conversing with her, he thought they could arrange about her returning to Camden to live with him, and knowing the disposition of his wife, he thought that writing to her would be futile, when she constantly avoided seeing him when he went to her house to see her and the children; that as early as the spring of 1905, the defendant had a conversation with him, in which she wanted to move from Camden and go to Swarthmore to live, and that he always protested, because his profession required him to live in this state; that between the time of this first conversation and when he went to Colorado, in the spring of 1906, he had two or three conversations on the subject. One was held in the office, and that she still persisted and urged that they move to Swarthmore, and that he replied that it was impossible; that while in Colorado, he recalled a conversation that they had had on the subject of moving to Swarthmore, and that he wrote her that while he would do anything in his power for her happiness and the happiness of the children, he could not move to Swarthmore, and that such a thing was impossible; that at one time, prior to June, 1906, his wife told him that if he didn't like the house in which they were then living in Camden that he could get out. During the summer of 1906, when the defendant was in Atlantic City, he regularly supplied her with money, and that she had a personal income of between fifty and seventy-five dollars a month, which she was receiving. While she was in Atlantic City he did not suspect that she had deserted him, but later he concluded that she must have intended to desert him from the time she left to go to Atlantic City. At that time he was sending her $25 a week, and now sending her $32.50 a week

for the support of the children; that his wife was living in Swarthmore "without his assent or consent."

Testimony was given by two colored servants of the petitioner, his stenographer and a plumber employed by him to do work at the Swarthmore house. One of the servants said that he heard Mrs. Jones say that she would not live in Camden; that she was going to Swarthmore to live. The other, that whenever the petitioner called at the Swarthmore house, the defendant would seem to know it, and on several occasions told him, "Mr. Jones is coming; I am going to Philadelphia;" and that the defendant told him on two or three occasions that she would never live in Camden again. The stenographer testified that Mrs. Jones wanted to move to Swarthmore on account of her daughter going to college, and that in the spring of 1906 the defendant was at the petitioner's office to talk about the purchase of the Graham house. Mr. Jones told her that he was perfectly willing to do anything that would add to her happiness and make her comfortable, but that she knew he could not live in Swarthmore, and that the defendant said that that was the house she wanted, and that she intended going there and that

"her tone conveyed the idea that she was determined to go to Swarthmore to live, and it did not make any difference whether he intended to go or not, or whether he could go. She did not say those words, but that was her tone of voice."

The plumber related that on one occasion, when the petitioner telephoned to his daughter, he heard the defendant say to the daughter that if her father came she would lock herself in a room so that he could not see her, and that at different times when he was working there he noticed that the defendant seemed to avoid her husband.

The corroborating testimony is fragmentary and equivocal, and was evidently moulded to give color to the petitioner's story. In the further discussion it need not be commented upon, except as the history of the case explains the true meaning of the defendant's action and of what the witnesses said Mrs. Jones from time to time stated.

37

The evidence given by the petitioner before the master was a bald perversion of the truth. That his wife left him, moved to, and was living at, Swarthmore without his "assent or consent," and that he endeavored to secure her return to him, is absolute fabrication. It will be observed that the petitioner altogether suppressed the purport of the letter to his wife of January 22d, 1906, in which he consented to her moving to Swarthmore, and the fact that he there bought and furnished a house which he was maintaining for his family—and the motive is obvious. The letter and the petitioner's operations in consequence, establish incontrovertibly that he was anxious for and consented to a separation. In fact, in his testimony at this hearing, with these circumstances confronting him, he confessed, as he was compelled to, that he consented to his wife's going to Swarthmore, but he endeavored to ameliorate the gravity of the situation in which he found himself—only to involve himself further—by the claim that the consent was to a temporary residence, until the daughter graduated, and that that was the understanding he had had with his wife. This avoidance is disingenuous. Why, if this were the arrangement, should he, as he testified before the master, immediately after he found his wife had gone to Swarthmore, try to see her to get her to come back to Camden? The purchase of a high-priced house, and large outlays for improvements, speak permanency. The failure of the petitioner to seek a termination of the separation when his daughter graduated, and the fact that in 1910 he bought two additional lots of land adjacent to his wife's home, for her use, add to his confusion and utterly rout his pretentions.

Although the defendant had gone to the home her husband had provided for her, the petitioner, without relating this important fact to the master, averred, as he did at the present trial, that it was not until then that he knew that she had deserted him. He pretends to have based this belief, principally, upon what he asserts to be the fact that his wife took with her everything, leaving only rubbish and the marriage certificate hanging on the wall. A disdainful abandonment of this token of their union might be significant if there were not other and controlling circumstances which were not brought to the master's at-

tention. The wife denies the charge, and I am inclined to disbelieve the petitioner as to the incident, and for this reason: In his testimony before the master, he said that when he returned from Denver on July 2d, to remain until August 28th, he found his family had gone to Atlantic City (he forgot to say that it was the annual custom), and having no place to sleep he moved to a room in his office building on Market street. Before me, he insisted that during that period he slept in the Seventh street house. The defendant testified that when she came up from Atlantic City in the summer she missed the certificate and telephoned her husband about it, and that he replied that he had taken it for safekeeping. He admits having such a conversation, and I believe that he took it before the family moved to Swarthmore. For, why should the defendant, if she had spurningly left it behind with a lot of rubbish, be so solicitous about it as to telephone?

But, aside from this, it is quite clear to me that the petitioner's explanation of this metamorphosis of a temporary separation (if it was that) to a permanent desertion, is an absurd prevarication. Domestic discord of a repressed character prevailed for some time before the separation. There were no violent contentions or outbreaks of passion; on the contrary, the manner of the two towards each other was gentle and polite, but cool. Some six months previous she had left his bed, because of an indignity, with which situation he was apparently content. Had he made the least advance, she doubtless would have rejoined him. He was generous in his money affairs and considerate of his wife's comfort and welfare. She, on the other hand, was complacent and hopeful. Their demeanor towards each other was an absolute contradiction of their sentiments. It's the familiar story of the husband tiring of his wife. She had lost her charms for him. Her personality and presence became intolerable. He was willing to provide, but not to embrace. Whether he had found solace elsewhere, is not clearly shown, but it does appear that later he lived in Overbrook, Pennsylvania, much of his time, in a family in which there was a daughter to whom he did not deny he paid attention. Before going west, in June of 1906, he told his wife that he would never return to the

Seventh street house. He virtually abandoned her then. He had previously threatened to procure a divorce. To a letter which she wrote to him while he was desperately ill, offering to nurse him, he made no reply. He claims to have not received it, but I think he did. To his son, who had told him that the defendant still loved him, he replied, with a laugh, "That's too bad; I am sorry. Of course, you know it can't be helped now." And that it was impossible for them to live together again because his wife was irresponsive and uneducated. To a message which the daughter carried to him he made a similar response.

That when the Swarthmore proposition was first broached, the petitioner refused to go there with his family, and that he told his wife, as he says, it would be impossible because of his profession, may be true, but that he was willing, if not anxious, that they should go, is also true. Vainly did he try to explain away the significance of the purchase and furnishing of the house. He protested vigorously and emphatically, he says, but, nevertheless, bought, because his wife, unknown to him, had entered into negotiations with the owner who threatened suit, and that he completed the bargain to avoid trouble, or, as counsel argued, out of self-respect. How impossible of belief this is, when we consider that the petitioner admitted on the hearing, that by the letter of January 22d he intended that his wife should select a house at Swarthmore for her home; that by her reply letter she informed him that she had looked at the Graham house; that she had spoken to him about purchasing it, at his office in the presence of his stenographer; and that he bargained with Graham and obtained it for $12,000 instead of $15,000.

The petitioner's testimony before the master, that he sought his wife with a view to a reconciliation, and that she evaded his efforts, is even more reprehensible. Upon his return from Denver, in July, 1906, he knew that his family was on its annual summer outing. He neither called upon, nor communicated with, his wife, and his reason for this, as given to the master— that he believed that she had gone away in one of her fits of anger and that it was best to leave her alone, and that she would get over it and would return to her home all right in the fall— in the light of the circumstances as they were developed at this

hearing, was manufactured to suit the occasion. After the family moved to Swarthmore, he visited his children there, only upon condition that his wife should be out of the house. Later on, he modified this, so that she might remain in the house, but must be invisible to him. When a visit was projected, he communicated by telephone, or, otherwise, to his son or daughter, notifying them of his coming, with a strict injunction that the mother must be absent. This we have not only from the two children, but also from the family physician, who carried some of the messages to the son and daughter. The defendant, silently and uncomplainingly, complied. She always vanished. At the time of the commencement exercises, when his daughter graduated, in 1910, the petitioner sent word, by this same physician, that he would not attend if his wife intended going, and, being assured that she did not, he went. He was beside himself with rage when he saw her in the audience. Furthermore, in his testimony at this hearing, he asserted that he ceased to love his wife when he found she had gone to Swarthmore. Is it likely that he would thereafter seek her? He also admitted that he never asked for her when he called at the house, or ever wrote to her or communicated with her by telephone (they had the facilities). His statement before the master that he did not write because he thought he could make himself better understood by seeing his wife personally, stretches one's patience to the breaking point.

The enforced absence or seclusion of the defendant whenever her husband appeared at the Swarthmore house, accounts for the testimony of the plumber and the colored servant. If she ever stated that she would never live in Camden again, as both colored servants say she did, but which the defendant denied, her declarations were perfectly consistent with her apprehensions that her husband was permanently estranged.

Process was served upon the defendant while she was summering at Atlantic City. The surprise and shock made her ill. The next day the son went to see his father and informed him of his mother's condition. He returned with a message to his mother that he had seen his father; that he was sorry that the matter had upset her so, and that he had said she should not worry any

more; that she could tear up the papers, and that she didn't have to go to Trenton. In the afternoon of the same day, the petitioner met his daughter at the ladies' waiting-room of the Pennsylvania station in Philadelphia. She wrote to her mother from Evanston, Illinois, where she had gone on a trip, that she had seen her father, and that he was very much worried over her condition, and that he had told her to tell the defendant, "She needn't worry; that everything would be all right, and that it wasn't necessary for her to go to Trenton." As a result of these communications, the defendant, although she was advised by her niece to consult counsel, refrained from putting in a defence, because, as she says, she trusted Mr. Jones and believed in him, and that thereafter she thought that the case had been dropped, and that she had no information to the contrary until her marriage anniversary, on October 27th, 1913, when the news was broken to her by her niece.

The petitioner himself interpreted the meaning of these messages as carrying an assurance that the suit would be withdrawn, but he denies the assertions of his son and daughter that he initiated them. To his son, whom he admits asked him whether the defendant would have to go to Trenton, he said he replied:

"It isn't for me to say what she has to do. Your mother has two courses open for her; one is to secure counsel, file an answer and fight the case; and the other is to refuse to do anything and, if she wishes, throw the papers in the fire. It is immaterial to me what she does."

And to his daughter, who was very much agitated, he claims to have said: "Don't you worry; you can't help this. It is not your fault. You go on your trip and enjoy yourself." The petitioner is supported in this statement by his stenographer, as to what he claims to have said to his son. But her exquisite recollection of what occurred a year and a half before, and which she described in the precise language used by her employer, impressed me at the trial that she had been coached. I believe the two children. I am convinced that they told the truth. What possible motive could they have had to bear false information which they must have realized would deceive their mother and aid in the wrongful purpose of their father? Why should the

daughter, when informed by her father that he had procured the decree *nisi,* as she did, express astonishment and repeat to him his broken pledge? It may seem odd that the wife should have rested entirely upon her husband's assurances, but she says that he always had been truthful to her; that she had confidence in him; that she trusted him, and then still loved him, and that she thought he would not proceed with the suit—and her manner on the witness-stand suggested that she was of a confiding, pliable and dependent nature. In her despair there still flickered hope of a renewed love. I think she was fully warranted in relying upon his representation, and the weekly remittances which he thereafter regularly made, reassured her that he had abandoned the proceedings. He thereafter acted as he had before, as the executor and trustee of her mother's estate, until May of 1913, and was acting as her agent in the collection of rents and other moneys, even to the time of this hearing. In November, after the petition for divorce was filed, he procured from the defendant (the children acted for her) a mortgage which she held on Camden property for the purpose of foreclosing it. These were all acts which naturally gave her the impression that he was not proceeding adversely, and that he had not abused her confidence. The defendant has not had her day in court. Of this she was deprived by the deceitful and fraudulent machinations of the petitioner.

From the foregoing review of the evidence it is manifest that the defendant has abundantly shown merits, as well as surprise, and that she is entitled to be protected by opening the decree, in order to admit her defence. *Miller* v. *Rushforth, 4 N. J. Eq. 174; Brinkerhoff* v. *Franklin, 21 N. J. Eq. 334; Day* v. *Allaire, 31 N. J. Eq. 303; Richardson* v. *Richardson, 67 N. J. Eq. 437; White* v. *Smith, 72 N. J. Eq. 697.*

There is another consideration which requires that this decree be vacated. The state is an interested party to the suit. Its interests have been imposed upon by the malevolent conduct of the petitioner, and public policy demands that its rights be vindicated.

It is urged that the defendant is in laches, because, as it is argued, she was careless in relying upon her husband's promise,

and that slight investigation would have put her in position to have timely defended herself. This argument is incongruous. It necessarily assumes that the defendant should have entirely disregarded her husband's promise to withdraw the suit, or should have regarded him as unworthy of belief; an assumption which is entirely inadmissible and comes with ill-grace from the petitioner.

The enrollment will be vacated and the decrees opened. On this hearing the main cause was retried. Both parties presented all of the evidence available on final hearing; and having reached the conclusion that the defendant was not guilty of desertion, the petition of divorce will be dismissed, with costs, unless the petitioner, on the settling of the decree, shall represent that he has further testimony, to be offered on final hearing.